UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
NICHELLE SWANSON,

                Plaintiff,

                           21-CV-10306 (JMF)

-v-

                           OPINION AND ORDER

SCHINDLER ELEVATOR CORPORATION,

                Defendant.
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       In this case, Plaintiff Nichelle Swanson seeks damages from Defendant Schindler Elevator Corporation ("Schindler") for injuries she sustained when she tripped and fell into an allegedly misleveled elevator at Lincoln Hospital. Before the Court are two motions filed by Schindler: a motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment, *see* ECF No. 41; and a motion, pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to preclude the testimony of a medical expert, *see* ECF No. 44. For the reasons that follow, Schindler's motion for summary judgment is GRANTED with respect to Swanson's negligence claim but DENIED with respect to her *res ipsa loquitur* claim; and Schindler's motion to preclude is DENIED.

## BACKGROUND

       Unless otherwise indicated, the following facts are undisputed.

**A. The Incident**

       Swanson worked as a clerical associate at Lincoln Hospital for eighteen years until her retirement in January 2019. ECF No. 43-1 ("Swanson Dep."), at 27. On September 28, 2018, Swanson returned to the hospital after picking up her lunch and called an elevator. ECF No. 52

("Pl.'s Rule 56.1 Response"), ¶ 2. As Swanson entered the elevator, she "looked down" and observed by "approximation" that the elevator car was raised "2 to 3 inches up" from the floor level. Swanson Dep. 73, 78, 81-82. By the time she noticed the alleged misleveling, however, it was "too late." *Id.* at 78. Swanson tripped and was "thr[own] []  in the elevator." Pl.'s Rule 56.1 Response ¶ 5; *see also* Swanson Dep. 73. She struck her head on the wall of the elevator; as a result, she became dizzy and "couldn't say anything." Swanson Dep. 85-87.

Jasmine Padilla, a hospital employee who greeted visitors, checked identification, and gave directions in the lobby, "responded to the elevator bank" after she heard a "bang." Pl.'s Rule 56.1 Response ¶ 10; ECF No. 43-8 ("Padilla Dep."), at 13, 29-30. Padilla found Swanson "on the floor" and observed that the floor of the elevator car was "unlevel[ed]" with the lobby floor — although she does not remember the degree of misleveling. Pl.'s Rule 56.1 Response ¶ 11; Padilla Dep. 11. Padilla then filled out a police report form, stating that Swanson "had trip [sic] coming into the elevator due to the elevator not being level with the floor." ECF No. 43-9. Later that day, Waleska Olmeda, Swanson's supervisor, signed an incident report on which someone had "already" written that "[t]he elevators need to be fixed because uneven level of elevator." ECF No. 43-2, at 2; *see* Swanson Dep. 108; ECF No. 43-10, at 33-34.

Shortly after the incident, Swanson was seen in the hospital's emergency room. An x-ray revealed no "abnormalities" in her right hand, right knee, and lumbar spine, other than "moderate degenerative changes." ECF No. 47-5, at 4-6. The next day, Swanson went to the emergency room at Pocono Medical Center, where she was diagnosed with "acute head injury, acute left knee sprain, and acute lower back sprain." ECF No. 47-6, at 39. X-rays revealed "no facial bone fracture," "no evidence of an acute fracture of the cervical spine," "[n]o acute intercranial hemorrhage," and "[n]o evidence of acute fracture or dislocation" in the right forearm and knee. *Id.* at 4-12. Swanson alleges that, as a result of her fall, she had to be treated with a concussion

2

specialist "every three months or every six months," Swanson Dep. at 207-08; stopped driving and had to retire due to memory problems, *see id.* at 185-87, 236; and experienced new pains in her shoulder and knees, *see id.* at 178-79, 227-28.  Prior to the incident, however, Swanson had been diagnosed with trigeminal neuralgia and suffered from associated headaches, memory problems, and dizziness.  *See* ECF No. 47-9, at 61, 66.  She had also undergone knee surgery in 2011, and was diagnosed with lumbar radiculopathy in 2017 and with tibial posterior tendonitis in 2018.  *Id.* at 114-17, 125-26; *see also* ECF Nos. 47-8, 48-9 (Swanson's prior medical history).

**B.  Schindler's Maintenance of the Elevator**

Schindler maintained Lincoln Hospital's eighteen elevators; the company assigned Anthony Kucic to the hospital as its full-time, on-site elevator mechanic.  Pl.'s Rule 56.1 Response ¶¶ 13, 14.  Kucic was responsible for elevator "maintenance, troubleshooting, and keeping everything running."  Pl.'s Rule 56.1 Response ¶ 14.  In that capacity, he "performed preventive maintenance, including routine visual inspection of equipment" for eight hours every month on the elevator car at issue — including on September 21, 2018, six days before Swanson's accident.  ECF No. 43-6.  Kucic testified that his "eyes are always open" for misleveling, although he did not check for misleveling every day or even every week.  ECF No. 43-3 ("Kucic Dep."), at 49.  He had repaired elevators at Lincoln Hospital for misleveling "more than once," Kucic Dep. 39, but he was not made aware of Swanson's accident and had no recollection of any accident due to misleveling in September 2018, *see* Pl.'s Rule 56.1 Response ¶ 19; *see also* ECF No. 43-4, at 3.

The elevators at Lincoln Hospital are identified both by car number (1 through 18) and New York City identification number.  Kucic Dep. 16-18.[1]  The New York City Department of

---

[1]   A "different number was listed outside the elevator than inside the elevator" and the numbers "differed by one digit."  ECF No. 51 ("Pl.'s SJ Opp'n"), at 12; ECF No. 43-4, at 14.

3

Buildings ("DOB") requires all elevators to undergo an annual Category 1 inspection, which covers elevator parts and mechanisms inside and outside the car, including the "car floor" and the "car floor to landing sill." *See* ECF No. 43-14, at 11 (test report sheet). The DOB issued violations for the elevator car at issue every year between 2012 and 2018 based on Category 1 inspections. Two are especially relevant here on account of their temporal proximity to Swanson's accident. First, the City issued a violation on January 17, 2018, for a "dirty pit." ECF No. 43-14, at 2, 7. Second, the City issued a violation on April 26, 2018, for deficiencies in the elevator's communications system and, again, a dirty pit. *See* ECF No. 43-14, at 9-11. In each instance, no other deficiencies were noted. *Id.*

Prior to her accident, Swanson never "had any problems . . . with [the] elevator" and never "ha[d] a complaint . . . concerning the leveling of the elevators at the hospital," although she observed mechanics "always fixing" the elevators. Swanson Dep. 69-70. Padilla testified that "[t]here was always something going on" with "the unevenness of the elevator." Padilla Dep. 30.

**C. Expert Testimony**

The parties each proffer two experts, an elevator expert and a medical expert.

First, Swanson proffers Patrick A. Carrajat, an elevator consultant who has testified "120 times" in elevator-related cases. ECF No. 43-11 ("Carrajat Rep."), at 1. After reviewing incident reports, deposition testimony, and DOB records, Carrajat concluded that "[t]he lack of detailed records showing the specific items of maintenance and repair performed on the elevator in question creates a issue of fact as to whether [] Schindler failed to conduct a reasonable inspection or maintenance of the subject elevator" and that "an elevator does not miss-level [sic]

---

Defendant does not dispute that Swanson's expert, Patrick A. Carrajat, used the correct number to search for records in the New York City database.

4

by more than ½ inch in its normal operation absent negligence in its maintenance, inspection[,] and repair." Carrajat Rep. 4, 7. Carrajat testified that there could be "multiple reasons" for the misleveling of an elevator, but he ruled out chip failure as the cause here because the elevator did not shut down. ECF No. 43-5 ("Carrajat Dep."), at 52-53, 60. Schindler counters Carrajat's conclusions with expert testimony from Jon B. Halpern, a professional engineer with "37 years of experience in the design, installation, modernization, and the maintenance of elevators and escalators." ECF No. 43-4, at 2. According to Halpern, Carrajat's conclusions are "erroneous and misleading" because elevators can mislevel for "many reasons," including "a spontaneous failure of a solid state or electro-mechanic component" and "power fluctuations." ECF No. 43-4, at 4.

Second, Plaintiff proffers Dr. Ashwin Malhotra, a board-certified neurologist. Dr. Malhotra concluded, based on a neuropsychological test of Swanson, Swanson's representations, and a review of some medical records, that Swanson "had a traumatic brain injury as a result of the fall injury." ECF No. 47-1 ("Malhotra Rep."), at 7. Dr. Malhotra did not review "records concerning . . . [Swanson's history of] headache or migraine" while preparing his report. ECF No. 47-2 ("Malhotra Dep."), at 202-03. On August 23, 2023 (two months after Schindler moved to preclude his testimony), Dr. Malhotra submitted a list of fifty-one studies that he "directly and indirectly referenced" in his testimony. ECF No. 53-2, at 1. For its part, Schindler submits expert testimony from Dr. Diego J. Herbstein, also a board-certified neurologist. *See* ECF No. 47-12. Dr. Herbstein reviewed Swanson's medical records prior to and following the incident and concluded that Swanson's symptoms "were not caused by the accident of record, but rather [are] chronic and degenerative in nature," noting that Swanson's "complaints preceded for many years the accident of file." *Id.* at 2, 18.

**SUMMARY JUDGMENT MOTION**

The Court begins with Schindler's motion for summary judgment. Swanson alleges a traditional negligence claim and a *res ipsa loquitur* claim. ECF No. 13-1 ("Compl."), ¶¶ 63-69. Schindler moves for summary judgment as to both. *See* ECF No. 42 ("Def.'s SJ Mem.").

Summary judgment is appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (per curiam). A dispute over an issue of material fact qualifies as genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam).

To defeat a motion for summary judgment, a non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading [] or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). In ruling on a motion for summary judgment, all evidence must be

viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Applying these standards, Schindler's first argument for summary judgment, which applies to both of Swanson's claims, is easily rejected. Attempting to cast doubt on whether or when Swanson was able to observe the misleveled condition of the elevator, Schindler contends that there is "no credible proof" that there even was a "defective condition." Def.'s SJ Mem. 10-11. But Swanson unambiguously testified that she observed by "approximation" that the elevator car was raised "2 to 3 inches up" from the floor level. Swanson Dep. 73, 78, 81-82. And that testimony is corroborated, at least to some extent, by Padilla, who testified that she observed that the elevator and the lobby floor were "unlevel[ed]." Pl.'s Rule 56.1 Response ¶ 11; Padilla Dep. 11. More fundamentally, it is well established that "the assessment of a witness's credibility is a function reserved for the jury." *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 194 n.4 (2d Cir. 2013) (per curiam); *see Moll v. Telesector Res. Grp., Inc.*, 760 F.3d 198, 206 (2d Cir. 2014) ("[A] district court may not discredit a witness's deposition testimony . . . because the assessment of a witness's credibility is a function reserved for the jury." (internal quotation marks omitted)). Accordingly, Schindler's attacks on Swanson's credibility are for a jury, not this Court, to weigh.

With that, the Court will address Schindler's more specific arguments as to each claim.

### A. Negligence

The Court begins with Swanson's traditional negligence claim. A plaintiff bringing a claim of negligence under New York law, which applies here, must establish that (1) the

7

defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the defendant's breach caused the plaintiff's injuries; and (4) the plaintiff suffered damages.  *See Green v. Schindler Elevator Corp.*, No. 19-CV-4677 (LLS), 2022 WL 4484542, at *3 (S.D.N.Y. Sept. 27, 2022) (citing *Ulerio v. Schindler Elevator Corp.*, No. 12-CV-1496 (DF), 2014 WL 1303710, at *3 (S.D.N.Y. Mar. 26, 2014).  A company that has agreed to maintain an elevator in safe working condition, as Schindler did, "owes a duty of maintenance, and can be liable to a passenger for 'failure to correct conditions of which it ha[d] knowledge,' or 'failure to use reasonable care to discover and correct a condition which it ought to have found.'"  *Ulerio*, 2014 WL 1303710, at *4 (quoting *Rogers v. Dorchester Assocs.*, 32 N.Y.2d 553, 559 (1973)).  Such a company may establish *prima facie* entitlement to summary judgment by presenting "competent evidence in admissible form showing that the elevator 'was functioning properly before and after the accident, and that, even if a defect existed, [the company] did not have actual or constructive notice of any such defect.'"  *Id.* (quoting *Morton v. Otis Elevator Co.,* No. 07-CV-469 (JTC), 2011 WL 2199848, at *5 (W.D.N.Y. June 7, 2011); *see also Green*, 2022 WL 4484542, at *4.  Upon the company's *prima facie* showing, "the plaintiff must come forward with evidence capable of showing that the defendant either: (1) created the defect; or (2) had actual or constructive notice of the defect.'"  *Meade v. Otis Elevator Co.*, No. 15-CV-4822 (LTS) (HBP), 2017 WL 6509259, at *6 (S.D.N.Y. Dec. 18, 2017) (citation omitted).

Here, Schindler has made a *prima facie* showing that the elevator was functioning properly before and after the accident.  Kucic conducted a preventive inspection just six days before Swanson's accident and discovered no leveling issues.  *See* ECF No. 43-6; *see also, e.g.*, *Skidd v. JW Marriott Hotels & Resorts*, No. 06-CV-1554 (DAB), 2010 WL 2834890, at *4 (S.D.N.Y. July 8, 2010) ("To constitute constructive notice, a dangerous condition 'must be visible and apparent and it must exist for a sufficient length of time prior to the accident to

8

permit the defendant's employees to discover and remedy it."). And Kucic testified that he had no recollection of any accidents due to misleveling in September 2018. *See* Pl.'s Rule 56.1 Response ¶ 19. To avoid summary judgment, therefore, Swanson has to point to evidence that Schindler "either: (1) created the defect; or (2) had actual or constructive notice of the defect.'" *Meade*, 2017 WL 6509259, at *6. Swanson does not even try to establish that Schindler created the alleged defect. And while she does argue that Schindler had actual or constructive notice of the alleged defect, her arguments fall short.

    First, Swanson offers no evidence from which a reasonable jury could find that Schindler had actual notice of any misleveling defect. For all the emphasis that Swanson places on the elevator's many DOB violations, *see* Pl.'s SJ Opp'n 13, 15, she does not dispute Halpern's clarification that these violations were unrelated to misleveling and that the corresponding Category 1 inspections revealed no problems with the "car floor," the "car floor to landing sill," or any other relevant elevator parts or mechanisms, *see* ECF No. 43-14, at 7, 9-11; *see also, e.g.*, *Linwood v. Schindler*, No. 16-CV-1020 (LAK) (RWL), 2019 WL 5722110, at *7 (S.D.N.Y. Jan. 25, 2019) (noting that a DOB inspection "conducted just three months before the incident cited no violation relevant to" the problem that allegedly caused injury). And although Padilla testified that there were "always" misleveling problems in the hospital's elevators, Padilla Dep. 30, Swanson has offered "no records [to] show that Schindler was aware" of that fact, *Linwood*, 2019 WL 5722110, at *7; *see id.* at *2 (granting summary judgment to elevator company even though the plaintiff "reported one of [] four incidents to a coworker and a supervisor," on the ground that this did not alert the elevator company to the problem).

    Second, there is no evidence that Schindler had constructive notice of any misleveling defect. Other than Padilla's conclusory and unsubstantiated statement that there were "always" misleveling problems in the hospital's elevators, Swanson offers no evidence of a "specific

9

defect, much less that a reasonable inspection would have revealed such a defect." *Stone v. 886 3rd Next Generation Hotel, LLC*, No. 99-CV-4780 (LTS) (KNF), 2002 WL 1977956, at *5 (S.D.N.Y. Aug. 27, 2002). Nor does Swanson argue, let alone show, that Schindler knew of other problems in the elevator that could have contributed to misleveling. *See Johnson v. Bon-Ton Dep't Stores, Inc.*, 278 F. App'x 56, 59 (2d Cir. 2008) (summary order). Finally, Carrajat's conclusion that "[t]he lack of detailed records showing the specific items of maintenance and repair performed on the elevator in question creates a[n] issue of fact as to whether [] Schindler failed to conduct a reasonable inspection or maintenance of the subject elevator," Carrajat Rep. 4, without more, is "mere speculation that a defect existed, and that Defendant had actual or constructive notice of such a defect," *Meade*, 2017 WL 6509259, at *7 (internal quotation marks omitted).

In short, Swanson fails to present "evidence capable of showing that [Swanson] either created the defect or had actual or constructive notice of the defect." *Id.* at *6 (cleaned up). Thus, Schindler's motion for summary judgment is granted as to Swanson's claim of negligence.

## B. *Res Ipsa Loquitur*

By contrast, the Court concludes that genuine disputes of material fact preclude entry of summary judgment with respect to Swanson's *res ipsa loquitur* claim. The common-law doctrine of *res ipsa loquitur* "enables a plaintiff to prevail in a certain type of circumstance in proving negligence even though the plaintiff cannot show exactly who or what caused [his] injury." *Manhattan by Sail, Inc. v. Tagle*, 873 F.3d 177, 180 (2d Cir. 2017); *accord Meade*, 2017 WL 6509259, at *7. Under the doctrine, a fact-finder may infer negligence merely from an event that caused the harm "if: (1) the event is of a type that ordinarily would not occur in the absence of negligence; (2) it is caused by an agency or instrumentality under the exclusive control of the party charged with negligence; and (3) it is not due to any voluntary action or contribution on the

10

part of injured party." *Tagle*, 873 F.3d at 180 (citing *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 55 (2d Cir. 1978) (per curiam)); *accord Meade*, 2017 WL 6509259, at *7.

Here, Schindler does not dispute that it had "exclusive control" of the elevators at issue,Def.'s SJ Mem. 15, and there are genuine disputes of fact as to the other two elements. First, a reasonable jury could find that misleveling of an elevator is an event "of a type that ordinarily would not occur in the absence of negligence." To be sure, Swanson's own expert acknowledged that the misleveling of an elevator could have multiple causes and that at least some of those causes are outside the control of technicians performing elevator maintenance. *See* Carrajat Dep. 52-53; *see also* ECF No. 43-4, at 4. But "the controlling law of this Circuit" does not require Swanson to "eliminate with certainty all other possible causes or inferences," *Meade*, 2017 WL 6509259, at *7-8, and it is the "long established jurisprudence" of New York courts in the Appellate Division's First Department (where Swanson's accident occurred and this Court sits) that elevator malfunctions like misleveling "do not occur in the absence of negligence, giving rise to the possible application of *res ipsa loquitur*." *Ezzard v. One East River Place Realty Co., LLC*, 8 N.Y.S.3d 195, 198 (1st Dep't 2015) (citing cases); *accord Gutierrez v. Broad Fin. Ctr., LLC*, 924 N.Y.S.2d 333, 334 (1st Dep't 2011); *Dubec v. N.Y.C. Housing Auth.*, 834 N.Y.S.2d 165, 168 (1st Dep't 2007); *Dickman v. Stewart Tenants Corp.*, 633 N.Y.S.2d 35, 35 (1st Dep't 1995). Furthermore, these cases accord with the approach of most courts in this District, which have held that "common sense establishes that an adequately maintained elevator should not" have problems such as "com[ing] to an unexpected and abrupt stop," *Ulerio*, 2014 WL 133710, at *8; *see also Gonzalez v. Otis Elevator Co.*, No. 09-CV-8905 (GBD), 2012 WL 993476, at *3 (S.D.N.Y. Mar. 26, 2012), or "hav[ing] its doors closing on and striking its passengers," *Linwood*, 2019 WL 5722110, at *9, and the Second Circuit's more general guidance that "[a]n injury suggests a malfunction which in turn suggests neglect," *Stone*

11

*v. Courtyard Mgmt. Corp.*, 353 F.3d 155, 160 (2d Cir. 2003) (internal quotation marks omitted). If Swanson's injury "was not the result of a malfunction attributable to negligence," Schindler "is free to offer evidence to that effect at trial." *Id.*

*Green*, upon which Schindler relies, *see* ECF No. 54 ("Def.'s SJ Reply"), at 6, is an outlier in this District and is in tension, if not inconsistent, with the Second Circuit's decision in *Stone*. There, the court concluded that the plaintiff had failed to "demonstrate[] that the alleged misleveling . . . was an incident of a type that ordinarily would not occur in the absence of negligence," even though the elevator company (also Schindler) seemingly failed to offer any alternative reasons for the misleveling. *Green*, 2022 WL 4484542, at *6. In doing so, however, the *Green* court relied primarily on cases from the Second Department, which — deviating from the First Department — has generally held that elevator misleveling is *not* the type of event that can support a *res ipsa loquitur* claim. *Green*, 2022 WL 4484542, at *7 (citing *Palladino v. N.Y.C. Housing Auth.*, 101 N.Y.S.3d 626, 627 (2d Dep't 2019); *Daconta v. Otis Elevator Co.*, 85 N.Y.S.3d 528, 530 (2d Dep't 2018)). The Court declines to follow *Green* given the "long established jurisprudence" in the First Department, *Ezzard*, 8 N.Y.S.3d at 198; the Second Circuit's analysis in *Stone*, which calls for asking whether the event at issue — here, a misleveling large enough to trip someone — is a "normal occurrence" that would likely exist absent negligence, *Linwood*, 2019 WL 5722110, at *10; *see Meade*, 2017 WL 6509259, at *7; and the general approach that courts have taken in this District.

Nor does *Skidd*, upon which Schindler also relies, *see* Def.'s SJ Reply 5, call for a different result. There, the court held that *res ipsa loquitur* did not apply because the cause of the elevator malfunction — a broken selector tape — was "known and agreed upon." 2010 WL 2834890, at *3; *see also Monore v. City of New York*, 414 N.Y.S.2d 718, 723 (2d Dep't 1979) ("[W]here . . . specific and overwhelming proof establishes . . . the cause of the accident, there is

12

no need for the inference of negligence created by the doctrine of [r]es ipsa loquitur and it disappears from the case."). Additionally, the defendants in *Skidd* had "painstakingly describe[d] how a selector tape can break for many reasons without negligence." *Skidd*, 2010 WL 2834890, at *4. Here, by contrast, "the parties have not identified, let alone agreed upon, whether the elevator actually malfunctioned and, if so, what caused it." *Linwood*, 2019 WL 5722110, at *10. Nor has Schindler "painstakingly describe[d]" how the defect came about. *Id.* Thus, *Skidd* is plainly distinguishable. *See id.* (reaching the same conclusion); *Meade*, 2017 WL 6509259, at *7 & n.3 (same).

Second, there is also a genuine dispute as to whether Swanson contributed to her accident and resulting injury. Schindler argues that evidence "confirm[s]" that Swanson's "well-documented osteoarthritis of the knees[,] complaints of bilateral knee pain," and "reported balance problems, dizziness, blurred vision and numbness and tingling in the feet" contributed to the accident. Def.'s SJ Mem. 16. That may be well be true, but it is far from undisputed whether Swanson's previously documented medical conditions were current at the time of her fall and, if so, how severe they were. *See, e.g.*, Swanson Dep. 119-21 (Swanson testifying that at the time of prior procedures on her knee, she "could still walk and . . . wasn't in that much pain"); *id.* at 128-30 (Swanson testifying that her previous balance problems were due to a pause in her taking medication and that she eventually "found out [she] can't just stop taking medicine, which is what [she] was doing"); *id.* at 129 (Swanson testifying that she suffered from headaches during February 2017 due to "stress at the time"); ECF No. 43-13, at 3 (medical report from 2016 reporting "no tremor" and "no unsteadiness" and that Swanson "does not fall when eyes closed or taking a shower"). Moreover, unlike in the cases cited in its memorandum of law, Schindler presents no evidence that Swanson herself mis-stepped or was otherwise unsteady in entering the elevator on the day of the incident. *See* Def.'s SJ Mem. 17-18; *see also Torres-Martinez v.*

13

*Macy's, Inc.*, 45 N.Y.S.3d 449, 451 (1st Dep't 2017) ("[T]here is evidence that plaintiff fell after misstepping on the escalator, creating the possibility that plaintiff could have contributed to her own injury."); *Meza v. 509 Owners LLC*, 918 N.Y.S.2d 78, 79 (1st Dep't 2011) ("[P]laintiff's reliance on the doctrine of *res ipsa loquitur* is misplaced under the circumstances. . . . [in which] [p]laintiff's fall . . . could have been caused by a misstep on [her] part." (internal quotation marks omitted)); *Petro v. New York Life Ins. Co.*, 715 N.Y.S.2d 725, 726 (2d Dep't 2000) ("[T]here is evidence that the plaintiff's own actions contributed to the accident.").

In short, there are genuine disputes of fact as to all three *res ipsa loquitur* elements. Accordingly, Schindler's motion for summary judgment must be and is denied as to that claim.

## MOTION TO PRECLUDE

Next, Schindler moves to preclude Dr. Malhotra's expert report and testimony. ECF No. 44. The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his or her opinion if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702 (amended 2011).[2] In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

---

[2] Rule 702 was amended effective December 1, 2023. The amended Rule now requires courts to determine that "it is more likely than not" that the four factors are satisfied before allowing an expert witness to testify, Fed. R. Evid. 702, but does not "impose[] any new, specific procedures," *id.* advisory committee's note to 2011 amendment. The amendment governs all proceedings commenced on or after December 1, 2023, and all proceedings then pending "insofar as just and practicable," United States Supreme Court Order (effective Apr. 24, 2023),

(1993), the Supreme Court emphasized the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 597; *see also Troublé v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302 (S.D.N.Y. 2001) ("[The] proffered testimony . . . must not only have a reliable foundation but also be relevant in that it 'fits' the facts of this case."). "The Rule 702 inquiry is a flexible one that depends upon the particular circumstances of the particular case at issue." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2016 WL 4077117, at *2 (S.D.N.Y. Aug. 1, 2016) (internal quotation marks omitted).

The focus of the Court's analysis "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. Ultimately, "expert testimony should be excluded if it is speculative or conjectural . . . or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (internal quotation marks omitted). Additionally, the Court should not "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). By contrast, "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21 (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" are not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

---

available at https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf. Because the amendment would not change the outcome here, the Court need not and does not decide which version of the Rule should apply. Above, the Court quotes the Rule's pre-amendment language, on which the parties based their briefing.

Applying these standards, the Court deems Dr. Malhotra's testimony admissible insofar as it concerns Swanson's head and spine injuries, but inadmissible to the extent he opines on Swanson's knee injuries. Schindler's most sweeping arguments in favor of preclusion are that Dr. Malhotra did not fully account for Swanson's pre-fall medical history and that he failed to cite any studies to support his conclusions. ECF No. 45 ("Def.'s *Daubert* Mem."), at 4-6. These arguments have some force, as Dr. Malhotra's report provided only a passing summary of Swanson's pre-fall medical history as "includ[ing] diagnosis of hip arthritis, left knee arthritis, asthma, hypertension, and trigeminal neuralgia since 2016," *see* Malhotra Rep. 6, and did not contain any citations. But Dr. Malhotra engaged in a more thorough review of Swanson's pre-fall medical records before his deposition, *see* Malhotra Dep. 24-25, 31-32, and, as discussed below, did ultimately (but belatedly) disclose "a list of publications" that he "directly and indirectly referenced" in forming his opinions, ECF No. 53-2. In any event, Schindler's attacks on this score are based in part on cherry-picked excerpts from Dr. Malhotra's deposition and are not enough to render his testimony regarding Swanson's head and spine injuries — which was based on an in-person examination and comparison of her then-current symptoms with those commonly associated with her pre-accident neurological and spinal conditions — inadmissible. *See* Malhotra Dep. 30-32, 243; ECF No. 53 ("Pl.'s *Daubert* Opp'n"), at 14. That is because "the lack of textual authority for his opinion[]" ultimately "go[es] to the weight, not the admissibility of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) (admitting expert medical testimony where the expert "could not point to a single piece of medical literature" supporting his conclusion, in view of his "background" and the "range of factors" on which he based his opinion); *see also Ulico Cas. Co. v. Clover Cap. Mgmt., Inc.*, 217 F. Supp. 2d. 311, 318 (N.D.N.Y. 2002).

Schindler also challenges Dr. Malhotra's qualifications to opine on Swanson's injuries.

16

More specifically, Schindler argues that Dr. Malhotra's testimony about Swanson's head injuries must be excluded given his acknowledgment that "the administration of neuropsychological testing falls outside his area of expertise." Def.'s *Daubert* Mem. 7. But that argument is misleading. Dr. Malhotra candidly acknowledged that he was "not familiar" with "certain tests appropriate to perform in order to reach the conclusions of executive function," including neuropsychological testing, but he explained that he based his report on tests that are used in *his* "domain" — that is, by neurologists — and with which he *is* "familiar." Malhotra Dep. 50-51. Thus, Schindler's challenge is fodder for cross-examination, not exclusion. More broadly, the Court finds no basis to exclude Dr. Malhotra's testimony about Swanson's head injuries on account of his qualifications or credentials, which include more than a decade of experience practicing and teaching neurology and studying brain injury and neurological disorders. *See* Malhotra Rep. 13-18; *Vazquez v. City of New York*, No. 10-CV-6277 (JMF), 2014 WL 4388497, at *12 (S.D.N.Y. Sept. 5, 2014). In a similar vein, the Court also finds Dr. Malhotra sufficiently qualified to opine on Swanson's spine injuries given, among other things, the neurological nature of his diagnosis of Swanson's spine injury, *see* Malhotra Rep. 8; his extensive "work in a spine center"; and the frequency with which he is called upon to opine on "indications for spine surgery," Malhotra Dep. 250. For these reasons, Dr. Malhotra's testimony passes the *Daubert* threshold of reliability insofar as it concerns Swanson's head and spine injuries.

The same, however, cannot be said for Dr. Malhotra's testimony regarding Swanson's knee injuries. Dr. Malhotra's diagnoses of Swanson's knee injuries appear to be entirely non-neurological. *See* Malhotra Rep. 8 (diagnosing "internal derangements" of Swanson's knees). Yet, by his own admission, Dr. Malhotra is not a surgeon, orthopedist, neurosurgeon, or neuroradiologist by training. Malhotra Dep. 212-13. Moreover, "none of [Swanson's] treating physicians asked [him] for [his] opinion concerning [] Swanson's knee condition." *Id.* Dr.

17

Malhotra further conceded that, while he "consult[s] with orthopedic physicians often regarding multiple joint injuries and the planning for surgery" and has "familiarized [him]self to some extent" with those inquiries, he "do[es]n't hold a board certification and there's no . . . specific residency-trained field for this component of [his] work." Malhotra 213-14. Thus, Dr. Malhotra's own testimony betrays his lack of superior "knowledge, skill, experience, training, or education" with respect to Swanson's knee injuries. *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016). Making matters worse, his conclusion that Swanson's "knee . . . arthritis and lack of cartilage were directly worsened by direct impact trauma onto the knees . . . with the fall injury" in 2018, Malhotra Rep. 7, is *ipse dixit* — that is, unsupported by any causal analysis, comparison with past diagnoses and symptoms, or even medical literature. In short, the Court concludes that Dr. Malhotra's testimony regarding Swanson's knee injuries should be excluded.

That leaves the question of what to do about Swanson's belated production of the list of publications on which Dr. Malhotra relied in forming his opinions. Swanson was arguably required to provide that list as part of Dr. Malhotra's expert report. *See* Fed. R. Civ. P. 26(a)(2)(B) (noting that an expert report "must contain," among other things, "a complete statement" of the witness's opinions "and the basis and reasons for them," as well as "the facts or data considered by the witness in forming them"). In any event, Dr. Malhotra repeatedly noted during his deposition that he would promptly provide such a list to Schindler. *See, e.g.*, Malhotra Dep. 69, 89, 98, 119, 130, 156, 158-59. Yet Swanson inexplicably waited until three months after the close of discovery, and two months after Schindler filed its *Daubert* motion, to produce it. *See* ECF No. 53-2; ECF No. 55 ("Def.'s *Daubert* Reply"), at 2. The Court is inclined to agree with Schindler that this delay warrants some sanction — albeit not the "severe sanction" of precluding Dr. Malhotra's testimony altogether, *Ritchie Risk-Linked Strategies Trading*

18

*(Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012), as the prejudice to Schindler can be remedied through other, less drastic means, such as an order requiring Swanson to pay some of Schindler's fees and costs or an order allowing Schindler to re-depose Dr. Malhotra at Swanson's expense.  That said, Swanson has not yet had the "opportunity to be heard" on Schindler's arguments for sanctions, Fed. R. Civ. P. 37(c)(1), because Schindler raised those arguments for the first time on reply, Def.'s *Daubert* Reply 5-6.  No later than **March 15, 2024**, therefore, Swanson shall file a memorandum of law, **not to exceed ten pages**, addressing whether sanctions are appropriate and, if so, what form such sanctions should take.  The Court reserves judgment on the issue of sanctions pending that submission.

## CONCLUSION

For the foregoing reasons, Schindler's motion for summary judgment is GRANTED with respect to Swanson's traditional claim of negligence and otherwise DENIED.  Schindler's motion to preclude Dr. Malhotra's testimony is GRANTED with respect to his testimony on Swanson's knee injuries but DENIED with respect to his testimony on her head and spine injuries.  Further, as discussed above, Swanson shall, no later than **March 15, 2024**, file a memorandum of law, not to exceed ten pages, in response to Schindler's Rule 37 arguments.

In addition, unless and until the Court orders otherwise, the parties shall submit a proposed Joint Pretrial Order and associated materials (in accordance with Section 5 of the Court's Individual Rules and Practices in Civil Cases, available at https://www.nysd.uscourts.gov/hon-jesse-m-furman) **within thirty days of the date of this Opinion and Order**.  (The Court will schedule a trial date — or a conference to discuss a trial date — after reviewing the parties' submissions.)  In the meantime, the Court is of the view that the parties should try to settle this case without the need for a trial.  To that end, the Court directs the parties **to confer immediately** about the prospect of settlement and conducting a settlement conference before

Magistrate Judge Ona T. Wang (or before another third-party mediator). If the parties agree that a settlement conference would be appropriate, they should promptly advise the Court and, if needed, seek an appropriate referral and extension of the pretrial deadlines.

The Clerk of Court is directed to terminate ECF Nos. 41 and 44.

SO ORDERED.

Dated: March 6, 2024
       New York, New York

_____
JESSE M. FURMAN
United States District Judge